Your Honor, it is my understanding that the appellants below will be the first ones to go to settle Brooks v. City of Seattle. You mean, when you say below, you mean... It turns out that in both of the panel decisions, the defendants have actually appealed and... The panel decisions don't matter anymore. If you're an appellant, you go first. And that is, Your Honor... I just meant which case. Oh, I'm sorry. Your Mattos? My name is Ted Buck. I'm here on the Brooks matter. On the Brooks matter. Okay. For Officers Damon, Jones, and Ernelis. Very well. Thank you, Your Honor. It's my pleasure to be before this honorable court today. If it's possible, Your Honor, if we could set the clock. I understand it's possible that you could set it to 20 minutes so that I don't, unfortunately, take over Ms. Mooty's time for the Mattos case. Sure, we could do that. Thank you. Your Honor, the taser has been in use for many years. It has proved to be a very valuable and variable tool for law enforcement to accomplish tasks that they could not otherwise accomplish without risking significantly increased numbers of damages and kinds of damages and injuries that people would face in the common course of police enforcing the law. The plaintiff's plan below in both of these cases was the same. They seek to isolate the taser as an individual item, an individual use of force, and try to get the court to not look at the fact that some alternative would have been imposed had the taser not been there. This court can't look at that. Under Supreme Court precedent, we know that the court has to take into account all of the circumstances that were there. And under this court's precedent, alternatives that were available at the time. Police officers go out normally with a variety of weapons attached to them. Is that correct? That is correct. They carry a gun, a handcuff, a billy club, a pepper spray, and now they have a taser. Well, some officers have those items, Judge Fischer. Which one would they not normally carry? Every department varies. For example, Seattle Police Department, where my clients all work, some officers are qualified through additional training, exposure to the product itself and to the taser. The taser is the addition to the arsenal of weapons that officers take to every crime scene or stop or whatever. Are they trained or are they not? And part of their judgment at every time is which of these weapons to utilize. They don't automatically pull a gun. No, Your Honor. I just want to clarify one thing, Judge Fischer, and that is that not every officer has a pepper spray. Not every officer carries a baton. Not every officer carries a taser. They have to be specially trained to carry the pepper spray, to know when it's appropriate to use, to understand circumstances when its use would not be appropriate. Same with the taser and with the baton, same thing. Yes, Your Honor. There was a taser present. One of the officers also had pepper spray. Those were the available ones. They do, Your Honor. I think you'll find it at Excerpts of Record, page 121. Both pepper spray and the taser in touch-stun mode or drive-stun mode are characterized as level one force applications, which is appropriate for passive resistance or active resistance, or things that are more than that on the part of the suspect. Level two would be things like striking instruments, a baton, something that could actually, if it struck somebody in the wrong spot, for example, in the head, could lead to serious bodily injury or death. A bean bag round fired from a shotgun, of course, if it hits somebody in the head or if it's too close and hits in the chest area, it could cause death. Those are level two tactics that would be above. Isn't taser with darts level two also? It is not, Your Honor. Under SPDs, I'm sorry, it is considered potentially a level two force. Because the taser with darts has the capacity to actually cause NMI, neuromuscular incapacitation, if the darts are separated sufficiently on the body of the suspect, it can cause the person to freeze up, fall over, and cause the kinds of injuries that we saw in the Bryan case that this Court recently decided. In this case, it was in the stun mode, is that correct? That's correct, Your Honor. Is the stun mode more or less forceful than the dart mode? According to what these officers knew at the time, based upon their training and their experience having been subject to it themselves. I'm asking what is the scientific aspect of it? You're saying that Seattle apparently raised it at level one. That's right, Your Honor. But you said dart mode can take it to level two. That's right. Stun mode, I've seen one report, the UCLA report, which cautions against using the stun mode because it can cause burning injuries. Your Honor, if you look at that ACLU citation and actually go to the taser material, it's apparent that what they're talking about is that in the immediate aftermath of an application of a drive-stun taser versus the dart taser, they're characterizing the two small burns that can occur, the sunburn-type burns that are associated with a drive-stun, as being more significant injury than the darts themselves. How much of the material not specific to this case is properly in the record before us or can be considered as a matter of judicial notice? For example, the materials that the taser manufacturer puts out about the capabilities and the level of shock that's administered. There are various factual assertions made in the briefing, and it's unclear how many of those are specific in these records, how many of them come to us from other sources, and what other sources we can consider. Well, I think I understand your question, Judge McKeon. I'm Judge Graber, but it's okay. I'm sorry, Judge Graber, I'm sorry. If I understand your question correctly, I'll answer it this way. This record is clear. Every party that is before the court today, in Mattos and in our case, the Brooks case, had ample opportunity at the appropriate stage to develop a record. And, in fact, in the Brooks case- That isn't my question, because the question is how many of the materials that are before us are appropriate subjects for judicial notice, and particularly including the manufacturer's own publications? Well, Your Honor, I honestly don't know what the standard for judicial notice would be under these circumstances. I would expect a court to require the parties to bring that information, which the parties believe to be necessary and important to the court's attention. Because, for example, the taser material. Taser's material has changed dramatically over the years as they themselves have become subject to lawsuits. You look at their material from 2003, it's very different than it is today, because they're trying to put information out there that will give them a buffer on product liability claims, failure to warn claims, those kinds of things. I'd note that the information that has been supplied in addition to what was actually in the record here is not clear as to when it came from the taser materials, whether it was ever before these officers, whether these officers were trained on the material that is before the court. And, therefore, I think that the court- Well, I believe that the order from Chief Judge Kuczynski said that the information that was added through the amicus was not part of the record and would not be considered. And I think for all those reasons, that's a terribly appropriate way to handle that material. Mr. Buck, as I understand Judge Ezra's decision, he said that there were fact questions that prevented summary judgment, namely the magnitude of Jay Zell's conduct. Why is he wrong about that? That would be the Mattos case, Your Honor. I'm here on the Brooks matter. Okay. All right. But the nice thing about the Brooks case is what you see in the record is all directly out of plaintiff's mouth. There is no dispute as to what happened in our case. Being stopped, the failure to sign, the warnings about- Well, that's disputed, is it? The failure to sign? Oh, no. No, she freely admits that she refused to sign. Well, I thought that she claims that she never got this citation. She claims at the end of her declaration, does she not? And you're claiming that that's the basis for her arrest, actually. The excerpts of the record make very clear- And this is a subtle maneuver, but it is a maneuver. You'll see in the declaration of Ms. Brooks that she only talks about whether she was handed the citation. And if you look at the entire record, you'll see that the officer's undisputed testimony is that she was- they told her that she was going to get a criminal citation, and she said, I'm not going to sign it. So it's not relevant whether or not she was actually handed it. She refused to sign. Mr. Buck, could you clarify one thing for me? Because I understand, taking the evidence in light, most favorable to the plaintiff here, that at the time the taser was utilized, Officer Arnalas had her left hand behind her back. Is that right? She had her in a pain compliance hold. That is her claim, your honor. That's the way she tells the story, correct? Yes. So she was under control at the time, according to her version of the event. At the time, the other officer used the taser on her. Well, your honor, I think there's a difference between a characterization of a fact and a fact. For purposes of summary judgment in this particular proceeding, we take her version as true, correct? She also- Because one of the officers says that he stepped away from the door. That's correct. At the time. There is a discrepancy in the facts there, your honor. Now, does that make a difference here, the fact that she was under control? Take her version, her hand was behind her back? It does not make a difference. Why not? Here's why. Because she also admits that she was physically resisting the officer's efforts to take her into custody. And the case law that we have cited, both Supreme Court and from this circuit, is clear. Until somebody is actually in custody, there's not even a detention. So to characterize somebody who's sitting in a car, in a pain compliance hold, but is still refusing to get out, still wedged in, still holding onto the steering wheel, as under control, she's not detained. She's not in control. She's not under their authority. Now, it's helpful to understand that when they used the taser, they did it in fairly rapid succession, three times. Is that correct? It's within the first application, 31 seconds passed. The record reflects that in that 31 seconds, the officers told her several times, get out of the car. She neither said, I will get out of the car, nor voluntarily got out of the car. After the second application, the record reflects, undisputed, they told her to get out of the car again. She neither said she would, nor did she try to get out. The third application came, I believe it was six or seven seconds after the end of the second. The district court said that the jury could conclude that she was incapable of getting out in the brief period between the three zaps. Do you contest that proposition? Well, Your Honor, I don't see anything in the evidence that supports that. Except that she had been tased and she was seven months pregnant and had to go to the bathroom. You haven't ever been seven months pregnant, having to go to the bathroom, behind the steering wheel of a car, and having been tased once. I think the jury could fairly conclude from that that she would not be capable of getting out of the car at that point. Judge Graber, this is why I'm concerned about this particular en banc appeal, because rather than looking at the record, what does a taser do to a human being? What did the officers know about that at the time? People tend to react very viscerally to two issues. One is pregnancy and pregnant women, and two is electricity. We're all scared to death of electricity for good reason. It can cause us harm. But the record shows that these officers understood that the drive-stun taser was not going to hurt a fetus, even if she was pregnant. That's not the point that I was making, though. You were arguing that the jury could not have concluded that she was incapable of complying after the first application. That's a different question. No, Your Honor. I'm getting to your answer, and I'm sorry if I was taking too indirect a route to it. You actually won't answer yours at all. Well, then let me just take a hint. Why don't you just answer the question? Is it possible from the record that she could not? No. Because... No, that wasn't the question. The question was, could a jury infer that she was incapable of getting out of the car? That's the question. I believe that the jury could not infer without speculation and ignoring evidence, because the evidence makes it very clear that once the taser is turned off, the pain ends. I've been tased. When you get zapped, it hurts, and then the pain is gone. And there is nothing in the record that suggests that she was unable to get out of the car. The problem is the successive tasing. I mean, it's like seconds go by. We could sit here, and when you subtract the five seconds from these applications that it might have been on the body, according to your officer, Myers, it's a fairly quick succession of, you know, 22 seconds or 30 seconds between the several. And the question is whether, you know, at this point she's no danger to anyone. Would you agree to that? No, I would not agree to that. Oh, you thought she was a danger? What would be the danger from a seven-month pregnant woman in a car that's been stopped? With the keys on. With the keys on the floor. She's not a danger at that juncture. Why didn't you just tell me she was a danger? What I'm trying to say is that it's not just is she a threat with a weapon or something like that, it's is she a threat to the safety of the officers or others like herself. And she definitely was a threat to the safety of the officers. Is she a threat to herself sitting in a car? Yes, she is. Yes. How is she a threat to herself sitting in a car being pregnant and being overweight? Because if the officers don't... Other than maybe a heart attack. If they don't have access to a pain compliance maneuver that can coerce her out of the car, they're going to have to pull her, which leads to the risk of rotator cuff tears, to dislocated elbows, to all the things that happen when physical force is the alternative to a pain compliance maneuver. And the information that is in the record shows that every one of these officers understood there was a greater chance of them being hurt and her being hurt if they had to resort to that kind of physical compulsion. Well, ultimately they just shove her out of the car, right? Ms. Brooks' own testimony is after the third tasing, she leaned to the side, away from the steering wheel, and at that point the officers were actually... They shoved her out of the car. That's right. So the taser worked. It did its job. If they had had to try to yank her out while she's still holding onto the steering wheel, still bracing herself in there as a large and capable woman... It does relax your muscles, if I recall correctly. I'm sorry? It does relax your muscles a little bit. The taser? The taser. I mean... Well, it depends on which kind you're talking about, Your Honor. If it's a dart spread... This is sort of afterglow. Well, Your Honor, actually, having been through training courses where many people are tased, I can tell you that the most frequent result of the end of the tasing cycle is a big grin on somebody's face, because the pain goes away. So I don't know if it relaxes the muscles. It feels so good when it stops. I'm sorry? It feels so good when it stops. I think that's a fair assessment. I just want to get the tasers at this point when she is stopped, and I do want you to go back and look at her declaration, because what she says at the end of her declaration is, my signing a criminal citation was never discussed, and I was never presented with such a criminal citation. It was not until my trial, when George is refusing to obey me, I realized I'd been arrested for refusing to sign. Now, I don't know if that's true or not, but we have to take it as true. You earlier said, no, no, it's absolutely clear that she was given a citation. But just starting there, don't we have to take her statement as true? Your Honor, it's perfectly clear that she was handed and refused to sign the speeding citation. The only issue in the record is whether Officer Ornelas handed her the criminal citation. Correct. And, no, you don't have to take that, because it's established as a matter of law. She was convicted of not signing the citation. PC is established as a matter of law under this Circuit's precedent and under the Supreme Court precedent. So at the point when she says she's not going to sign or she doesn't think she's handed it, but she doesn't think she's been speeding and they have this discussion, how long a period elapses between that time and the time they used the taser initially? A fair amount of time. What is a fair amount of time? What does the record reflect? The record reflects activities, not precise time, Your Honor. It reflects that two officers talked to her about signing, that it's not an admission of guilt, and that if she just signs, she can go. They called a sergeant to the scene. They tried an armbar maneuver, turned the car off, demonstrated a taser, tried the armbar again, and then started tasing. That's a substantial period of time. I'm not clear. Why is there time to force out of the car? Because she was under arrest, Your Honor. And so at which point is she under arrest? When the officers told her that she was under arrest for refusing to sign. For refusing to sign what? Well, whether it's the criminal citation or the traffic ticket, it doesn't make any difference. Both are arrestable. Is that true? Is that true under Washington law? Yes, Your Honor. I asked a question and you said it doesn't make any difference. It's a very bad thing to do. Assume it does make a difference. Do you remember my question? If your question is, does it matter? My question is what my question was. Do you remember what it was? I'm sorry, Judge. I guess I didn't know. Was it for refusing to sign the ticket or for refusing to sign the criminal citation? You said it doesn't matter. I don't want to hear it doesn't matter. Okay. I'll explain why I said that. I don't want to hear it. I want to hear which of those things she was being arrested for. If she was arrested for refusing to sign. Which one? What was she arrested for? For refusing to sign which? Both. Both are arrestable offenses. What was she in fact being... I asked you why was she being forced out of the car? You said because she's under arrest. I said under arrest for what? You said refusing to sign. I said refusing to sign what? And this is where we've been stuck. Okay, refusing to sign what? Now fill in the blank with either of the following words. Citation, ticket, or citation. This one. This one of those. The officers say criminal citation. She claims a notice of infraction. Either one is an arrestable offense, so it doesn't matter. So on this side we have to assume, take her evidence, right, because that's how we view a matter of summary judgment. Your Honor, you do not because probable cause to arrest is established as a matter of law by her conviction. This is a red herring. Probable cause to arrest was never even appealed in this case. It couldn't be because it's been established in a criminal court. I understand your answer. The question I have is why are they forcing her out of the car? Because she was under arrest. As of that point, they're trying to force her out of the car. She was under arrest for having committed what crime? For having committed the crime of refusing to sign, well, from the officer's perspective, the criminal citation. From her perspective, the speeding ticket. But it doesn't matter because they're both arrestable. What was she convicted of? She was convicted of failing to sign the traffic ticket. The speeding and the school zone ticket. That's correct. Which is a civil infraction under Washington law, which one can be detained long enough to identify the person, check for outstanding warrants, and so on and so forth, and issue a notice of infraction. That's what the statutory authority is under Washington law. RCWS 4664 says that, however, the arrestable offense for her failure is under 4661, which is not part of the traffic code. It is an officer authority and enforcement statute, which leads, which says specifically, Where does it say that you can take someone into custodial arrest for speeding in a school zone or for refusing to sign? RCWS 4661 makes it a misdemeanor to refuse to sign RCWS 1031. To refuse to sign what? A citation or a notice of infraction? Either. You keep relying on the conviction, but how do we know when the event of conviction took place, the offense that gave rise to conviction? When the what, your honor? When the event that gave rise to conviction took place. We know she was convicted at some point for at some point failing to sign the ticket, or something, right? But do we know that this happened while she was still in the car? It could have happened later, right? Because she never did sign. No, I don't think it could have, because those facts would have never been in front of any tribunal. How do we know? You want to rely on the judgment. You want to say, well, the judgment washes everything out. But how do we know when that crime occurred, when she was convicted, though? I believe my confusion with your question stems from this, Judge Krasinski, and that is that We have to take the facts the way the plaintiff says they happened, because that's the way it was in summary judgment. She claims she was only presented a notice of infraction and refused to sign and was arrested for that. That's what she was charged with and convicted of, which establishes probable cause. But even if there hadn't been that criminal conviction, establishing probable cause is a matter of law. RCW 4661 makes failure to sign a traffic ticket a misdemeanor, which under RCW 1031 an officer has the right to arrest for as long as it occurs in his presence. And there's no dispute that this occurred in his presence. So I'm saying the PC is red herring because of the conviction. But even if there hadn't been a conviction, PC to arrest was there. The state of Washington, as a matter of public policy, puts these laws out there for a reason. The officers are hired by the people of Washington to go out and enforce those laws. So you would admit that it's highly unusual for someone to be arrested for exceeding the speed limit in a school zone. That's a highly unusual occurrence, isn't it? I don't think that you're using a strong enough adjective, Your Honor. I think it's ridiculously strange. And it's because she was arrested because of her extraordinarily aberrant behavior. Ms. Brooks could have ended this at any time if she had behaved in any way, shape, or form as a reasonable person would. So is it your argument that simply refusing to sign the citation was sufficiently aberrant behavior to justify an arrest? Is that your argument? It was under state law at the time. Now, the law has changed, Your Honor. In 2006, the legislature changed that law and made it so that it's no longer a misdemeanor to refuse to sign traffic infractions. But at the time of this incident, it was an arrestable offense. These officers didn't want to take Ms. Brooks into custody when they pulled her over. They wanted her to sign the ticket. Did they tell her she's under arrest? I'm sorry? Is there some claim she said they said you're under arrest when they tried to pull her out? She admits that she understood she was under arrest. They knew she was pregnant at the time. Whether it's in or outside the record, I'm not sure whether it is. But the International Association of Chiefs of Police, as an exemplar, recommends against using tasers on pregnant women. They knew she was pregnant. They were trained with that in mind. Is that correct? Your Honor, the training on tasers for – if I may just take a break for a moment. The IACP was in 2005. No. Okay. The IACP was in 2005. The IACP's guidelines, the taser company's guidelines today, and the training of the Seattle Police Department has always been to exercise caution in using the taser against people who could be harmed because of that. Because she was pregnant. Were they trained not to use it on pregnant women? They were not, Your Honor. They were not. Even though you would seem to have been trained at the time, it was recommended against using on pregnant women? It was not trained to these officers at the time, and I don't believe that your assessment of it is correct, Your Honor. I don't think that those – I'm just looking at it. I might have looked at enough of the material to try to predate this incident, including that it was excused first by the initial others. All right. I would say recommended against pregnant women. The only thing that these officers knew at the time, which is what they're to be judged by under all of the precedent of this circuit and the U.S. Supreme Court, was that the taser in drive-stun mode did not have any effect on a fetus. Okay. Thank you. Thank you very much. We'll hear from the monitors. Good afternoon. I'm Juana Rudy. I represent Officers Agarano, Aikala, Kunioka, and McKnight in the Matos case. I think the primary issue in this case is whether or not a taser used in a specific factual situation where you found a belligerent and noncompliant suspect is unconstitutional. And I think that it's clear that at the time of this incident, which was in August 2006, there was no law that said the use of a taser in such a situation would be unconstitutional. In fact, I think the case law says otherwise, such as in Hinton, Draper, and Russo, which established that, in fact, the taser usage in those cases were, in fact, constitutional. So I think the problem that the plaintiffs have in both of our cases is that there was no clearly established notice to the officers that use of the taser in this situation would have been a violation of the suspect in either case. They're constitutional, right? So this person, this officer, who's talking about being pushed back against a criminal court under an outreach regime regulation to be a taser in Dartmouth. He was shooted, as Cynthia said, with a knife right into her hand. One more instance of anything. He was within a few feet. I don't think the record establishes exactly how many feet, but he was within close proximity of her. And that was an authorized use under our use of policies. I think that's disputed. The officers agree that they do, but what the plaintiff, J. Delmato, says that she didn't hear a warning, which under the case law doesn't necessarily mean that a warning was not given. So isn't that a disputed fact, then? I don't believe so for purposes of this argument. I believe that, based on the record before this court, that we can infer or believe that that did happen. That what did happen? That the warning was given. Why, if she says she didn't hear a warning, and the officers say they gave a warning, why wouldn't that be a disputed issue of fact for a jury to decide, thereby precluding qualified immunity? I don't think that the warning's mandated. But isn't that an issue? It could be, yes. But I don't think it's dispositive of this particular case because of the fact that the use of force that the officer used, which was the taser after being pushed, and the push is not disputed, was appropriate under these circumstances. So the fact that a warning was not given... No, there is a dispute about push. She says that she was just covering her chest so that somebody wasn't smudging into her breasts, and she was not pushing. She was asking to go outside where she could get people to calm down and talk to her. She was the victim, initially, to this domestic dispute. She was not suspected of having committed any crime, correct? Correct. However, I would correct the record in terms of what she stated. In the excerpts of records, she, in fact, does say that she puts her hand on the officer's chest and extends her arm. The difference between us, really, our side and her side, is that we call it a push and she doesn't. But it's not that she was covering herself and never made the contact with the officer. Her version is she's trying to avoid being smudged rather than pushing. That is not the same as pushing. Exactly. Okay, so one version is she's pushing, and the other version is she is not. And you agree that she had committed no crime. Right, she committed no crime prior to the officers being called there, but the officer, from his perspective, was being pushed by her. On summary judgment, we have to use her perspective. Because it was your clients who sought summary judgment. And her version was that all she did was to say, can we go outside and everybody calm down and let's please talk about this. My children are sleeping. Let's kind of keep the temperature down. That's all she did under her version of the facts. And I have yet to hear how that justifies the use of any form of TASER, let alone the DART mode. I think what you're missing is that this all starts by her getting in front of her husband once she finds out that he's going to be arrested and telling the officers that they're not going to take her husband and, therefore, interferes with the arrest. That's where the problem is. She had the ability to comply by moving out of the way and allowing them to arrest the husband, but she would not do that. And then she extends her hand into the officer. Just physically, can you describe the situation where the officer stepped inside the doorway and her husband was on the interior, correct? Yes. How much room are we talking about? There were four officers on scene, correct? There were four officers on scene, but at the time that the TASER was deployed, there were only two in the house. Two were right outside the door. It sounds like they were in a tight little area. Is that true? There was no way around her besides the intruders? There was no way to get her husband besides moving her out of the way. They were in what my understanding is is her living room, but there's a couch or a bed-like item in that living room space as well as their television. So from my understanding, it's a confined area, and there were a number of items strewn about the area, which made it, I believe from the officer's perspective, feel a lot more confined. That's why there's only two in the house at the time. May I ask you, was she a threat at that moment when they TASED her? Yes. An immediate threat? Yes. Or was he the threat? They both were a threat. And how was she a threat? The threat was her... Was she an immediate threat? Let me put it that way. She was an immediate threat from the officer's perspective because of her resistance to, one, moving out of the way and, two, having physical contact with the officer. Earlier, I believe it was Judge Fisher was talking about how officers show up at the scene with a belt and all types of tools on them. In our jurisdiction, they do carry everything that was listed off by Judge Fisher, and we train our officers to keep a significant distance, typically, if you can, two arm lengths from a suspect to prevent the suspect from being able to get any of the items on your belt. We show up with a gun to every fight, and the problem with that is that if they were able to get that gun, this case would go bad quickly. And do you think that by TASING her, that might have provoked her husband? It did provoke her husband once he saw that, but the option to the officer at that time was to strike her based on our training. Now, the panel characterized the situation as, if I remember correctly, as posing a risk for the immediate danger, which is different. I believe so, yes, posing an immediate threat, but the thing is that we're looking at it from the officer's perspective, not the 20-20 hindsight, which Graham forbids. It's really for that officer he believed that she was a threat at that time. Thank you. Is it disputed what her attitude was? When you say that she was preventing his arrest, I was wondering if she was saying, let's step outside, let everybody calm down, and let me take care of that.  And once she realized that her husband was under arrest, was belligerent and noncompliant. But in addition to that, you've got her six-foot-three, 200-pound, combat-trained Iraqi soldier husband standing immediately behind her. That's why I'm having trouble visualizing the scene. You've got four officers on the scene, and the one who gets TASED is not the big guy, it's the woman who's saying, can't we all calm down? I think that in terms of us sitting here and talking about it, maybe it sounds like a calm situation, but at the time it wasn't. I'm just trying to recreate for today, I'm only trying to recreate what actually happened. And it seems startlingly accelerating to deploy a device that's designed to be used and encouraged to be used at a distance. And he reports, instead of pepper spray or something like that, for the baton and pushes her back with the baton and out of the way, or takes him in a compliance only posture of the suspect, he brings out the dart gun at a close proximity. Those things accelerate at a very high rate. Yes, they do. Could you have hinted with this baton? I don't believe in this situation. Are you asking in terms of what we train? No, I'm asking what he's entitled to. Instead of using the TASER, what if he pulled out his baton and struck her with it across the side of the head? No. Why not? Because our training trains that that's a higher level of force than the TASER in a case like this. Struck her across the arm? For one thing, he wouldn't have been able to deploy the baton. We have a monadnock, which requires you to flip your wrist and pop it out. It's steel. It's about almost three feet in length once it's extended. And in this close proximity, I don't think he would have been able to do that. It's still pretty effective even without popping out. You can hit somebody pretty good with that even when it's collapsed, right? Would not want to be hit that way. I agree with you. I would not either. What's he entitled to? Counsel in Brooks, Mr. Buck, said that there are levels of force, and he said that use of a TASER, and this was in the dark mode here, right? Yes. Could be a level two force, which he put in the same category as deploying a baton. So I'm just wondering, could he have deployed a baton here? Our level of force is not the same as it is in Seattle in terms of how we designate it. A TASER use is a TASER use in our jurisdiction. So, in other words, a TASER use or an OC spray are considered the same level of force. Whether it's in dark mode and what is it? And prongs. I'm sorry? Or the prongs, either way. We treat them the same. Is there another alternative at the same level of force that the officers could have used? Pepper spray. So either pepper spray or a TASER in the situation, in your view? Right, but we train our officers not to use pepper spray in an enclosed environment, and in a situation like this where everybody's close, they would have dosed everybody had they used it. There's no risk of death at all. I mean, I know there's no risk of death with pepper spray. Is there no risk of death or serious bodily injury with TASERs at all? We don't train it that way. You can have secondary injuries. If she was standing near the edge of a stairwell when we treated her. Could you have a heart attack? I'm sorry? Could you have a heart attack? I don't believe that the material says it would substantiate something like that. People have had heart attacks as a result of coincidentally being TASED. I've seen some reports. I don't know of anybody having a heart attack from being pepper sprayed. I'm not aware of anyone who's had a heart attack from being pepper sprayed, but in this circumstance in an enclosed environment, and the fact that you're going to dose everybody in there, I think that would have been a mistake. Will you address the timeframe 2006? Let's assume that given the circumstances, there were deemed to be excessive force. Would you address the qualified immunity issue? If there had been? Yes. That's one option, but let's just say they had used excessive force, but what was their reasonable belief at that time? The officer's reasonable belief at that time is that Jay Zalmatos was a threat to him. What does that mean, reasonably? That means, from our perspective, that he had the ability, therefore, to use force against her because he considered her to be an immediate threat to the safety of him, and that's under Graham v. Conard, and it's the most important factor of the three. Why isn't his perception of the danger a jury question, whether his perception of her was reasonable or not? Because at that, then, would usurp the whole concept of qualified immunity. Well, suppose she makes a funny face at him, and he thinks she's a danger because of that. I think that would be a different fact scenario, but in our case, we have the hand to the chest, and this volatile situation, I don't think there's any... Well, he wouldn't have the right to shoot her, right? No, this isn't a lethal force case. Well, I mean, the question is whether her provocation was sufficient to justify what happened. Judge Ezra says that's a jury question. What about that? I think that that's the problem with disregarding qualified immunity. The idea of qualified immunity is to get the officers out before that. There's no clearly established right, and in this circumstance, clearly there's not. There's a clearly established right not to be subjected to unreasonable force. I agree. You're trying to convert into a judge, screening out based on whatever arguments you can make characterizing the evidence as to whether it was reasonable or not. And if it gets to the point where it's on the cusp, I think it's a problem for qualified immunity to decide. ...that if they believe her, and all she was doing was clearly pushing a way to keep him off of her chest area, that that would be unreasonable, and for him to immediately resort to a very punishing device, a dart and a taser. I think that one gets decided on qualified immunity. Right. And I think that that's appropriately so, because otherwise it completely annihilates the whole theory of qualified immunity if we always let a jury do it. But your version of it would take it away from the jury essentially every time. Every time. I think that that depends on what's before the court. I think in our case, the record was clear enough for Judge Ezra to do that, and that's why the panel agreed with us. Well, the panel didn't have sufficient evidence by telecommission about what the nature of the taser was. I think that's the flaw of the plaintiff's counsel in that case, because we did provide that. Whether it's the plaintiff's flaw or not, I'm just saying, the problem is we're comparing two different police departments who were using tasers in what appears to be a materially different way, even as between themselves. I mean, they go to stun mode in close-up, and they go to stun mode or dark mode, and dark mode is a much more aggressive use of the taser, by some perceptions, than stun mode. There may be conflicting evidence about that. But you're saying that on these cases, we should just decide that police departments can use tasers so long as they can spin together a scenario that creates an aura of reasonableness and that we should, under the guise of qualified immunity, can say, well, that's okay. I don't think that we should. Have you been tased? Yes, by probes. By probes? Yes. All right. I did not do the dry stun. So maybe I'll let the judges on this panel speak for themselves. Can I do the shooting? That might really be on the record. I'm not trying to be facetious. Actually, my concern about the panel was that endorsing the technology that is counseled for perhaps is new. It was to invent a less-than-lethal technology to do precisely what counsel argued, which is to give police an option. But the problem is that at least on some elements, on both cases, it appears that that use of less-than-lethal force is kind of being used like, okay, we've got this weapon. We can use it when somebody puts their hands up. Wow, they can get tased. And we're supposed to decide that an average citizen for a minor offense or for no offense at all can be subjected to these darts at high impact. That's very troublesome. I think one of the concerns, Judge Fischer, that I have about your statement, with all due respect, is that if we put too many restrictions on the use of the taser, then we really make it the equivalent of a firearm, and that's really not what it was meant to do, and it has been tested on over a million subjects safely. So my concern is that we not make it something like that. I believe it's in our excerpts we have. I could find you the citation, but offhand I did not write that down. Counsel, can I just ask you a quick question? Sure. When the police arrived, they saw a very large man who had been drinking sitting on the steps, and they knew that there had been a fight and that things were being thrown around. Did they have any reason to believe that she was abusing him? I don't think when they arrived at the scene that they necessarily knew that. However, the daughter, who was a 14-year-old, that called 911, said that she heard her mother say, Troy, don't whack me. So the inference for the officers was that he was the aggressor. Right. You talked early on about her stretching out her arm, and I can't find it. I don't see it, but I'm looking at the transcript of her deposition. Can you point out where that is? It's at Exhibits 119-122 and 131-132. And what is that? Those, I believe, are deposition transcripts. I'm looking at deposition transcripts. What page of deposition? 119-122. Who's deposition? Giselle Motte. 119-122 of her, you have transcript pages. Let me, can I just grab mine? Yeah. Where in the excerpts are those pages? It's in Defendant's Appellate Excerpts of Record, Volume 2. Okay, I got it. Volume 2. What base number? At 122, or I'm sorry, at 120. Is that the base number? Yes. Bottom right. And 121. Well, at 120 she doesn't say she stretched out her hand. This sort of goes in a series, and so if you look, I guess it would be most accurately 122. Then you put your hands up, yes, after you ask contact with you, correct. I mean, you're looking at page 74 of the deposition, right? Yes. Okay, I'm looking at page, I've got an entire deposition here. So what exactly are you looking at? I'm sorry? Yeah, this is page 74 of the deposition. Okay, and then I think maybe, how about if I direct you to page 132, I'm sorry. That's page 101 of her deposition. It doesn't say she extended her hand. She says in that portion of her deposition, she says it's the opposite of what you just suggested, that she says she had, after he had contact with her, she put up her hands. This is, are you talking about 132? No, 122. At 132 she says, did you extend both arms or just one? And her answer is, I don't recall exact details where or how my hands were. Well, but the sequence is, the pergaminate of that was still pushing up against your brawls, correct? Yes. But then she goes on, the deposition, I mean, we're taking a little snapshot, but if you read the series of it, the series is according to her that he bumps into her, moves back, she puts her arms out on him and pushes him because she doesn't want to touch him. This is page 100 of the deposition, page 131. Did you extend your arm? Did I extend my arm? Yes. I guess I may have just to keep him from thrashing his body against mine. But that's after she says initially that she didn't do anything until after he had already contacted her. So her version is, he comes into contact with her, backs up, and she tries to keep him from coming into contact with her again, right? That's her version. Okay. What would you do? Would you push away? Wouldn't that be a normal reaction from somebody who's being pushed again? Push away. I wouldn't touch a police officer. So if, well, never mind. Okay. Thank you. Thank you. We'll hear from the other side. We'll hear the Brooks case first. Please record Eric Zabell appearing for Malika Brooks. I was just getting comfortable for another 20 minutes, so now I'm going to try to get organized. First of all, I'd like everyone to know that I've never been cased. That never happens. We can arrange it. We can arrange it. I hope you like my argument better than that. It's not so bad. Your Honor, the facts as they were presented, to the extent that we're able to. We'll give you 20 minutes in case we run over. Thank you. The facts as presented by Mr. Buck, who admittedly was interrupted several times as he was trying to present them, I think leave a lot to be desired, and I think that while some very good observations were made by Your Honors during the course of his argument, I think it's important to try to get a picture of what was really going on here and what these officers were really confronted with. Were they, had they arrested her when she was in the car? No, she was not under arrest. She was being detained for a traffic stop. She was never told that, Ms. Brooks, you are being placed under arrest. We are reading you your rights. We're taking you off to jail, and you're being arrested because you refused to sign a citation. You disobeyed the police orders. Were they entitled to arrest her? I beg your pardon? Were they entitled to arrest her? No. Why not? Because no probable cause existed to do so, and here's why. And this is the point that... Mr. Buck says that refusing to sign a citation at that time, or a traffic ticket as opposed to signing a citation, was an arrestable offense at the time. Mr. Buck is wrong, and this is why he's wrong. We attached to the record here, I believe it's attached to the brief, the two citations themselves. When I say citation, that's really an improper use of the word. I mean, this is why there's been so much confusion here. It was really only one citation, and that was the citation, the criminal citation. And that's what Mr. Buck is telling you would support the arrest. Well, he also stated, to Your Honor's question, that the civil infraction would support the arrest. That is, the refusal to sign the acknowledgment of the civil infraction would support an arrest, and that's not true. This is in the nature of a refusal to appear in court. And if you read what this civil infraction says, and we've all been there, all of us have had speeding tickets. What page are you on from the excerpt of the record? Well, I'm looking, Your Honor, at the S.E.R. 19. It's the Appellee's Exhibit 4, Appellee's Supplemental Exhibit 4. And I'm looking at the civil infraction, which is S.E.R. 19. There's a place in the lower left for the motorist to sign her name. And this is a speeding ticket. I'm sorry, which page of the S.E.R. works? S.E.R. 19, the Appellee's Supplemental Record. Okay. And it says, without admitting to having committed each of the above offenses, by signing this document, I acknowledge receipt of this notice of infraction and promise to respond as directed in this notice, not promise to appear in court. This is a civil infraction. Under Washington law, it will not support an arrest. You cannot be arrested and taken to jail. You say so, but the book says otherwise. So what have you got to back you up? A second ticket, Your Honor. And that's the citation. What page? This is S.E.R. 21. Now, if you look at that, it says criminal traffic. This is the citation that says refuse to sign NOI, a violation of Seattle Municipal Code 11.59090, subsection C. And what does that say? Right above the place you're supposed to sign. Quote, without admitting to having committed each of the above offenses, I promise to appear as directed on this notice. That's the only citation that will support an arrest. Which one was she convicted of? She was convicted of failure to sign the infraction after being directed to do so. It's a little confusing. Well, I mean, it matters here because he says once convicted, the probable cause basically goes out of its face. So the question is, was she convicted on this piece of paper, S.E.R. 21, which is called a citation? Well, she may have been. Let's assume she was. Let's assume she was. Then why would that not be sufficient to take this issue of probable cause out of it? Well, for this reason. It's not a false arrest case. We're not suggesting that the arrest was no good in the sense that she was falsely arrested. We are saying that there was no reason to use force. I know what you're saying, but remember my question. This is where we got started. And now you're shifting gears. I want you to stick with my question. My question is, was she arrested when she was in the car? Yes or no? Not, you know, was it a false arrest or anything else? Was she arrested? You said no. And this is why we're going down this road. If your answer is yes, then we're going to go a different road. So is it yes or is it no? She was placed under arrest while she was sitting in the car. Okay. So if she is under arrest while sitting in the car, what are the officers entitled to do to effectuate the arrest, which means subdue her and, if necessary, transport her to jail? Well... They can't just leave her there because she's under arrest, right? She's under arrest. They aren't entitled to extract her from the car or order her or get her to come out, yes? Assuming that she has violated a law of the state of Washington. No, I'm not making any assumptions. She's under arrest. You just said she's under arrest. You surely agree that they have a right to arrest her. I mean, to implement their arrest. Well, I was attempting to respond. Well, if she's in the car and she's under arrest. So let's leave the conviction aside. She's in the car. She's under arrest. What do they do when she's under arrest? Well, then, since we understand your question, she's under arrest. What are they entitled to do to her? That's exactly what we all want to know. Okay. Well, they're entitled to use the minimum amount of force necessary. They're entitled to use reasonable force. To be slightly more accurate. Under the police department guidelines. I don't care about the police department guidelines at the moment. We're worried about the Constitution. And they're entitled to use reasonable force. So the question is, was this reasonable use of force in all the circumstances? Well, and I think applying Graham the fatality of the circumstances, it clearly was not. And the reason it was not. They asked her to come out, right? Yes. And she refused. She declined. She didn't do it. They then tried to force her out by physical force, by grabbing her arm. And she stiffened her body and refused to be extracted, right? Well, I'm sorry, but you say she refused to come out of the car. She did refuse to come out of the car. She didn't, in fact, come out of the car. She was told to get out of the car. She asked, and it's in her declaration. I can read it to you. She asked the officer, why do I have to get out of the car? And according to her declaration, she didn't get an answer to that question. That's when the door opened. That's when her arm was put, her left arm was put behind her back in the goose neck. You know, you may have won that kind of argument with your mother, but it's not going to work here. If a police officer says, get out of the car, and you do anything other than get out of the car, in my book, it's refusing to get out. Whether you do it because you say, gee, you tell me why, or you know, you didn't say Simon Says, or Mother May I, you know, it doesn't matter. If you do something other than, assuming you're capable of doing it, I mean, obviously if you're sick, or you've got a broken leg or something, you can't stand up, but if you're physically able to do it when an officer tells you to get out of the car, you don't. To me, that's refuse. Now, we can quibble language here, but the fact of the matter is she could have gotten out of the car. She was physically able to get out of the car. She, in fact, did not get out of the car. She didn't get out of the car when ordered to do so. Okay, and then they laid hands on her, and instead of going along with that, she stepped on her body, and she held on to the steering wheel and made herself, made it so that they couldn't extract her, right? No, no, that's not correct. She did not hold on to the steering wheel. They're saying that she held on to the steering wheel. And what has happened in this case, in this case... Is she disputing that she held on to the steering wheel? Yes, in this respect. Where is she disputing this? She's saying that she had one arm, her left arm, behind her back, and she's using her right hand to blow the horn. Now, Mr. Buck has taken that, and he is saying that that's an admission that she was resisting arrest. Why? Because the police officer said she had both hands on the steering wheel, and she was hanging on to the steering wheel when they were trying to get her out of the car. She did not specifically deny in her declaration, I deny that I was hanging on to the steering wheel with both hands. She didn't have to. She described what happened. Was her son in the car when all this was happening? I beg your pardon, yes. Was her son in the car? No. No, he had been told to leave before this got started. He was... Excuse me. Where was he? He was being transported to school, and this happened in front of an elementary school on a residential street, after she was pulled over, and the scenario started with Officer Nielus, the officer that issued the citation. She told her son to get out of the car and go to class, and so he left. Assuming they have the right to remove her from the car, let's just start there. Assuming they have the right to remove her from the car, what can they do to get her out? Well, they're the ones, they're the trained police officers. They're the ones who are supposed to use that level of force necessary to do the job. But there's a certain point in time when they can... Ask me, what can they do? They can take her by the wrist and pull her out of the car. Can they tear gas her? No. Can they pepper spray her? Can they pepper spray? Well, that's a tough one. I don't think... I think if they pepper sprayed a pregnant woman under this fact pattern, I'd be standing here. I may not get the same sympathy, if I'm getting any at all, for the use of the taser three rapid times in succession. It seems to me there are only so many ways you can pull somebody out of a car who doesn't want to come out, and usually, you know, when you have a bunch of cops wrestling with somebody, the somebody usually winds up on them and they lose the end of it. Here, you know, they got her out of the car with virtually no injury to anybody. A lot of injury to her. Which is what? Well, she was tased three times. What injury did she sustain? She's got a permanent scar on her neck from a taser burn. Is that a little thing on her neck? No, no, her neck. Is it a spot? Where I'm pointing. Is it a spot? It's a keloid scar. Anything else? Well, she's got a scar on her shoulder as well, where she was tased, where I'm pointing. Anything happen to the baby? I don't know about the... Anything happen to the baby, sir? Not that we're aware of. The baby appears to be healthy. I just want to make sure I'm clear. She was taken to the hospital that day? Correct. And was she admitted? Yes. Held up. Just for observation and for a couple of hours they determined that she had tachycardia. She was observed and then released. It was determined that she was pregnant, seven months pregnant. But fortunately there's no harm to the child that we know of. Used to be a normal child. But you know, your honors, you have to really look at the way these police officers conducted themselves. I mean, you had Officer Jones, the man with the taser. He's angry. And she's describing how angry he is. And the manner in which he tased her... She could have put a stop to that anger by getting out of the car. Not after the tasing started. In her declaration... Sir, let me just ask you, is it a question of timing in other words? Clearly it's a bizarre situation, which I think even the officer's counsel said. If you go to school, you have your child, the next thing you know you've been tased, okay? So is it a question of once they said you're under arrest and released out of the car and she didn't get out right away, should they have waited longer before trying... And they have the arm behind the back at this point. Should they have waited longer or were there other options they should have employed before the taser? So my question to you is, is it a question of using escalated force too soon? Or as Judge Silverman is saying, were there any other options they could have employed before they employed this? Well, I think it's yes to both questions. I think you could have pulled her out of the car by taking her by the arm. Well, you take her out by the arm. You could dis-correct her shoulder. You could, I mean, depending on whether she's got a bracelet or anything there, they could tear her skin. Pulling somebody out, I assume she's a normal-sized adult and she's pregnant to boot, so she's got extra weight she's carrying. If you try to yank somebody out of their arm, you cause serious permanent damage. I mean, this is the kind of damage that surgery couldn't put straight. Two healthy police officers on the scene, supervised by their surgeons. Well, what are they supposed to do? Each of them could grab her underneath her left arm and pull her out of the car without subjecting the taser. What if the taser didn't exist? Were there male officers or female officers? Two male officers. And you think having male officers laying hands on a woman to pull her out of the car is sort of trivial? I mean, it's hard to grab a person without coming into contact with intimate parts of their arm. Well, that is a consideration. At the end of the day, they did, together, push her out of the car. One of them pushed and the other pulled. After they had tasered her three times, she became immobile. I mean, the whole... She never did get out of her arm. Well, no, she didn't. In her declaration... Any particular reason? Well, because after the third tase, she was incapable of doing so. Earlier? Before the third tase? Or before the second tase, or before they put the alarm off on her? According to Ms. Brooks, there was no way to get out of the car when she's behind the steering wheel, Officer Johns is in front of her administering the taser, and Officer Arnelius has got her arm behind her back. That's her version of the facts. It's substantially different from Mr. Brooks. What are your arguments that she didn't have a chance to rethink her position? Your argument? I think it's, in all fairness, it's not the kind of situation a woman would find herself in, where she would be expected to calmly rethink her position. She was probably very frightened and in a great deal of pain, and she was obviously on the verge of hysteria if she's blowing the horn. I mean, they stood outside the car before they opened the door and taunted her with that taser. They cycled it in front of her. She didn't know what that device was, and Officer Johns is telling her, this is going to hurt a lot. By making that statement, this is going to be very painful. That's a statement that Judge Johns thought placed the knowledge in the minds of the police, that they knew they had a very painful device, and they didn't really need to use it. Well, it's also an escalation. It's a way of not using. It's letting her know, look, we're serious. We have it here. This is going to hurt. You have another chance to consider. It's sort of pulling it out and using it immediately, as perhaps is the case in the other case we're considering. Well, I agree with Your Honor that escalation is a factor here, and these officers are trained not to escalate a circumstance such as this, but to calm the person down. So if you had to do it over, if you were the officer's position, what do you think they should have done? What would you have done? Well, I'll tell you what I would have done. I would have done what they didn't do. I would have taken that criminal citation. Show us what the lawyers say. I would have taken that criminal citation, the only citation that would support an arrest in this case, and I would have walked up to Ms. Brooks and I would say, look, we're not talking about a traffic ticket anymore, Ms. Brooks. We're not talking about a speeding ticket. This is a criminal citation with a promise to appear, and if you don't sign here, I'm taking you to jail. You will be placed under arrest and taken to jail. They've been told by their sergeant to book her. What's he supposed to do then? Say to the sergeant, no, I'm not going to? Well, Judge Jones was confronted with precisely that question, and in his opinion, in his order denying qualified immunity, his observation was that if the supervising officer has the responsibility to give the correct order, and that does not excuse the remaining officers, the two arresting officers, from the responsibility not to exceed the force in making the arrest, and there's legal authority in his orders that supports that. Was she ever told that she was under arrest at the time? Not in the record, Your Honor. I can find no evidence. He said she was going to go to jail, correct? She was told that you're going to jail while they were taunting her with the cases. That's true. But she was not told, after they opened the door to the car, she was not told you're under arrest and you're going to jail. So is your view that they trumped up the citation after? Yes. And what's the evidence of that? Well, the time stamp on the two citations. Now, you know, Judge Jones didn't think much of the argument, and he says so in his opinion, in his order, but we looked at the time stamps and there's a six-hour time lag between the time stamp on the civil infraction of the speeding ticket and the citation, the criminal citation, refusing to obey the police officer, that criminal offense. And that, together with the fact that Ms. Brooks testified, and this is part of the record, when she was being prosecuted for resisting arrest in the municipal court, and she stated, the first time I saw that criminal citation was when they were waving it around the courtroom in my criminal tribe. Now, she's entitled to be believed, and that's a material fact here. She was acquitted of the resisting arrest? Yeah, well, she wasn't acquitted. The jury was hung and the charges were dismissed. But, you know, I know I'm probably getting close to my time here. You're over your time. I'm over my time. Well, may I be permitted to make one last comment about probable cause? Go ahead. Thank you. The probable cause issue, Your Honors, the reason I think it's important and that it's been addressed in the briefing, is that if there was no criminal offense committed in the presence of these officers that would support the arrest, no force can be used to arrest her. That's where the probable cause issue, I think, is important. Thank you, Your Honors. Okay. Thank you. Good afternoon. My name is Eric Seitz, and I represent the plaintiffs in the Mathos case. Before I begin, I'd just like to apprise the court and acknowledge I received some assistance in preparing for this argument from a number of law students from the UC Irvine Law School, and I just want to thank them publicly for having assisted us in this connection. It's our position that a judge or a jury in this case could easily find that the police officers used unreasonable force when they shot Gisele Mathos with the darts on August 23, 2006. For all the reasons that people have asked questions of opposing counsel, there are factual issues here of great substance, and the record does not support a categorical determination that anybody can make, which is why Judge Ezra ruled as he did, with respect to the justification for the use of force under these circumstances. There are clearly material issues of fact. Well, for purposes of qualified immunity, we're supposed to give the facts in light most favorable to the nonmoving party. And any conflict in the material facts are supposed to resolve in favor of the nonmoving party. That's correct. So, if we do that here. If you do that here, presumably you still may move on to the qualified immunity, the legal issue of whether or not the taser was an instrument that could have been used. Let's talk about that for a moment, because we haven't talked about that issue very clearly yet. Let me just ask you, first of all, our version of the events appears substantially at our supplemental excerpts of the record, page 22, which is J. Delmatos answered a derogatory. That is our version of the events. The first question is, is there a constitutional violation here? A reasonable fact finder could find the fact that she alleged, and is there a constitutional violation? Let's just assume for a moment that there is. Yes. And get on to the second step for a moment. I'd like to explore for just a moment. Which is, is the law, or was the law clearly established at the time of these events? First of all, let me respond to that by saying, Jeff, I think you have to acknowledge that the taser is not a toy. I know several people have said they've been tasered. I have not. But it is a serious instrument that incapacitates the subject. There's no question about that. And it incapacitates the person and causes pain, as there is ample testimony in the record here, for the purpose of being able to subject that person to a seizure. So, the mere use of the taser is a use of force which is directed toward making a seizure under the terms of the Fourth Amendment. Secondly, what did the police officer know in August of 2006? The police officer, first of all, had his training. His training indicated that there were rules and procedures for the use of the taser, to which my opponent has alluded. He indicated that there were policies of Maui County, and those policies were part of his training and the rules for using the tasers. And as she indicated, the taser is the equivalent to a chemical spray, under their guidelines, and is only supposed to be used when a person is actively resisting. There is a provision that allows for passive resistance in a demonstration when a supervisor is on the scene and directs it, such as the Headlands case, perhaps. But that's not his case. In this case, it's only supposed to be used when a person is actively resisting arrest. Let me be a little more specific then. I'm willing to give you all of that. But if in August of 2006, when these events took place, let's just assume these are very diligent officers who read cases from the federal courts. Or their lawyer reads them. And gives them a weekly or monthly or bimonthly or whatever educational program. What would they have been told? What would they have been apprised of? Okay. What would they have been aware of? First, they would have been apprised of what the taser manufacturer puts out on its website. I'm not talking about what the taser manufacturer, I'm talking about cases. Okay. I'm coming to that. Judge, I'm coming to that. I promise you. They would have been advised of Graham v. Conner. And they were. Counsel mentioned that. And Graham v. Conner was clearly the law at that time. 1989 decision of the Supreme Court. They could and they would have been advised of a series of cases in this court from 1990 and 1992 in the Milpitas case. Now, admittedly, the circuit court case was not a published opinion. But the district court was. And it was affirmed on appeal. And it talked about the unconstitutional potential of the taser if used under circumstances where it wasn't warranted. Counsel mentioned both the Russo case. I don't remember. I think she mentioned the Draper case as well. But those are cases in which there was extensive discussion. They came out basically saying that the taser in those cases- Let me just go back. In the Milpitas case was a district court case in which district? 11th District of California. Affirmed by this court. And so the officers in Hawaii are given to have notice of an unpublished district court decision across the ocean? No, the district court decision was published. And there was appeal. So it's imputed to them as a district court opinion? Well, let me go on. As I say, that was the leading case in the Ninth Circuit at the time. I will submit. But then you go on. You have the Headlands case in early 2000s. You have the D'Orly case in which Judge Silverman dissented. But nevertheless, the analysis is all there. The analysis is if you use a new implement, a bean bag filled with pellets, or if you use pepper spray for demonstrators, that you have to be conscious of the fact that you have to apply the Graham v. Conner criteria. There's no question that a conscious police officer, a trained, knowledgeable police officer, when he or she chose to use any implement of force... Well, you're back to Graham. I mean, all these cases don't seem to add anything except to say apply Graham. That's right. I'm back to Graham. I'm happy to apply Graham in this case. And that's what Judge Ezra did. And Judge Ezra said, when I apply the three tests in Graham, basically I find sufficient conflicts of fact that I cannot come to a clear determination that qualified immunity is available to these police officers merely because they chose to use a Taser. Isn't Graham a test as to whether there's been a constitutional violation, not whether there's qualified immunity? No. Graham is a test to determine whether or not a reasonableness of force would be known to, or should have been known to, a police officer. What is it that constitutes a reasonable use of force? And if the police officer did not know that what he or she was doing could constitute an unreasonable use of force, then he or she is deemed to have made a mistake and is not personally held liable for it. So it's not a subjective whether or not the officer would have known. That's right. Whether a reasonable officer would have known. Well, it is not a subjective test because that's what Graham decided. It is an objective test. So would a reasonable officer in the place of Officer Aikala in August of 2006, would he have known that using a Taser against this woman, who was the person they went there to protect, should he have known that the use of that level of force was unreasonable? That's the question we've been asking. What is it that the British told him that it was unreasonable? She didn't do anything. She stretched out her arm and pushed him. Well, Judge, you and I had that discussion when we argued this at the trial. We argued the position of transcript here. She did lay hands on him. There's no dispute on that. Read her testimony, which is under oath, at page 22 of our excerpt of the record. That's her version of the events. She said, as a number of your colleagues have pointed out today, that the only time she raised her hands when he pushed up against her, she put her hands to keep him from pushing up against her. She said she may have extended her arm to create some distance between her and her breasts. Well, how do you create a distance between yourself and somebody else without pushing on them? Well, those are factual issues that we will demonstrate. Remember, we have not had an opportunity to cross-examine or even depose the police officers. The police officers' versions, if you read them carefully, which are also in our excerpts, are very different in many respects. So, how she extended her arm, what extent, to what purpose, all of that is very disputed, and a jury can decide, quite clearly under those facts, that putting up her arms was purely a defensive mechanism, that she did nothing offensive by word or by action, and that she, therefore, was entitled and justified in doing so. That's what a jury could decide. And if a jury were to so decide, then the use of a taser under those circumstances was patently unreasonable. Yes. Could you please direct me to what cases hold that by in the year 2006, that the use of a taser was excessive force and was a violation so that policemen could be guided by that? As I see it, in 2004, we had Draper and the decision there was that tasers were OK. We had Hinton and Russo before that, tasers are OK. What case would give notice to a assiduous reader of federal reports that the use of a taser was not OK? Well, let me tell you the answer twofold. First of all... No, no, no, no, not twofold. One case. One case, Milpitas. Milpitas. Milpitas, which was a 1990 decision of the district court, affirmed by this court in 1992. That's correct, except the district court opinion was published. The other thing is... And that was a taser case? I'm sorry, yes. Milpitas was a taser case. Yes. The other three cases that you mentioned also get notice, because those cases don't turn on whether you can use a taser. They turn on whether a taser is appropriate and reasonable under the circumstances. And if you read them carefully, those are cases where in one case, in the Russo case, a man had two knives in his hand and he kept coming at the police officer. What knives did Mr. Draper have in his hand? Mr. Draper... He didn't have anything in his hand. Mr. Draper, however, was shown on a video which was taken at the scene of being very, very aggressive, according to the court. Belligerent. Belligerent, yes. And that... Basically, the court said under those circumstances, it was not unreasonable to use the taser. But those... You said something else. You said unless there's an active resistance to arrest, the taser can't be used. That's Maui County's rule and regulation. Now, what about active impeding of arrest of another person? That is very hotly disputed. If you look again at Ms. Natto's rendition of the facts and her husband's as well, which is in our excerpt, you will see that basically all she did was she said... She didn't say, don't arrest my husband. She placed herself between the officer and the husband and she extended her hand in order to gain space. That is all interpreted. And let me tell you, Judge, somebody asked the question earlier how many police officers were there. There were three officers inside, not just two. There were three officers because Officer Kudayuki, by his own statement, which is in our excerpt to the record, followed Mr. Aikala, Officer Aikala, into the apartment. The fourth officer was right there standing outside. A reasonable police officer could say that this woman was getting in the way of his arrest and touching him. That would not be enough. No, it would not. Could he use a billy club at that point? He could certainly push her out of the way. If he struck her, I would be here arguing as well. And again, if they had used a taser on this supposedly drunk individual, and we don't concede that he was drunk either, but if they had tasered Croy instead of his wife, I doubt that we would be here making this argument. Because the only allegations with respect to anybody confronting and challenging the authority of the police were directed against her husband, not Chazelle. Chazelle, as somebody said earlier, was clearly the peacemaker. All she was saying to the police is, please, let's take this outside. Her five-year-old son was... She called the men, right? I'm sorry? She called the police in. No, it was her daughter who called the police. I need to recall that she is the one who directed the daughter to call the police. She may have directed the daughter to make a 911 call, that's correct. So she did call the police. Yes. I mean, she calls the police to the scene, the police come and do exactly what they're supposed to do, which is go inside and make sure that she's not abused inside or bleeding, you know, whatever. And then she tries to sort of ease them out. She tries to, you know... There's obviously a confrontation, and it's a potentially dangerous situation, and she does what the police should have done. She says, let's take this outside where my seven children, including my five-year-old on the couch, will not be drawn into this situation. Clearly, a jury can find that she was the peacemaker. She was in no way... Well, you can see there's a peacemaker, or you can see there's somebody who's trying to exercise control. The police are there to do their job, and she's saying, don't do it this way, do it this other way. Yes, Judge. And gets into a situation with pushing them. We could... You're right, but that's the question the jury has to decide. And that's why Judge Ezra said this case goes to trial. And they don't lose anything by doing that on these facts. At the end of a trial, they can move for a directed verdict if the facts warrant a determination of qualified immunity at that time. What's that qualified immunity again? Because you, in the qualified immunity answers, you said, what you're looking to determine, of course, is whether the police officers objectively would know that this is unreasonable force. So my question is, are we wrong to focus on whether or not there were taser cases? Or rather, given that this whole basic concept of unreasonable force being a constitutional violation has existed for many, many, many years, unrelated to taser, is this a case where we don't need, in order to exclude qualified immunity, we don't need a taser case, but we should take into effect the information that the officers have or not? Such as about tasers and what's available to them. And then we look at what an objective officer would do with that. I agree with your latter statement. I do not think you need a fact-specific case involving tasers in order to determine whether the police officer on this occasion knew or should have known that his resort to this level of force was unreasonable. What do we do with Bryant versus McPherson? Well, I'm troubled by Bryant. I'm troubled by the fact that we thought this court was going to hold Bryant until after this on bank. So I'm troubled by that. But I do read those opinions very carefully. And I find, at least in the opinions that just came out a week or so, two weeks ago, that there is an explanation which purports to suggest that our cases are essentially fact-laden cases to determine not whether there was qualified immunity, but whether or not the force that was used in those cases was reasonable. And I think because our cases, as everybody has observed, including the panel decision in our case, because these cases are not really well-developed factually, because of the stage at which this interlocutory appeal... There was one point about Bryant, though, that on the qualified immunity prong, the clearly established law prong, the Bryant panel said, and I think it was 2005 when the events in Bryant took place, that the law was not sufficiently clear in the context of the use of a taser. And I realize that the factual circumstances of Bryant were different. But the panel, nonetheless, concluded their opinion by saying that the law was not clearly established and that a reasonable officer in the position of those officers in that case would not have understood that their actions would have been unlawful. And I disagree with that again. Well, but that's what the case... That's a panel case. This case is not taken en banc, and it's a panel decision, and it's authority. It is authority, and I'm troubled by it, as I said. Don't ask me what we do with it. I think you disapprove of it. Because I think the Graham versus Conner certainly stands for the general overarching principles that are necessary to determine these two cases today. And I think in addition to that, because I don't see any recognition in the Bryant decisions, I think there are cases, taser cases, some, as I said, went the other way, that provide the frame of analysis coupled with the one prior Ninth Circuit case here and the other cases involving the various different forms of force, the Dworley case, the Headlands case, and so forth, all of which set out a frame of analysis which I think dictated this case, that the police officer knew or should have known that the force used here could be determined by a judge and jury to be unreasonable. And I think that's sufficient for us to show at this point. Now, again, as I said, we go to trial. We have to make some determination as to what level of force a taser is. We've got somewhat disparate and sometimes highly divergent views. To some, it's just sort of like a joy buzzer. No big deal at all. It's a huge disruption of the nervous system, and you fall down, and all sorts of horrible things happen to you. And, you know, depending on which view you take as to what tasers, the effects of tasers seems to me that that has a fairly significant influence as to when it's appropriate to use them. Well, I understand the diversity of views, and I'm somewhat disturbed by those people who say that this is like just a brief shock, and you feel better when you wake up from it, because... You don't wake up. It stops. I understand. But, again, I'm disturbed by those kinds of representations. Why are you disturbed? Well, first of all, I read the website for the manufacturer, which contains all the warnings about when it should be used and not used. I read Mr. Burton's amicus brief in this case, which suggests Amnesty International, a number of other studies, which have indicated the serious problems that tasers can cause. Now, I don't advocate, and you asked me this at the panel argument, I don't advocate that tasers should not be used at all. I think they are a useful weapon for police officers, certainly useful in lieu of using their firearms. However... Which technically blows cars, for example? They need to be used properly. They need to be used under limited circumstances, consistent with their training, consistent with the policies and practices of their police department, and consistent with the warnings that they've received from the manufacturer and from others who study. But the question of when it's appropriate depends a lot on what you think the effect is. If the effect is simply to give people a start, with no other consequences, it's quite different than saying it makes you pass out and fall to the ground and go into an epileptic fit. And I've seen both descriptions and everything in between. How do we know what exactly, or how do we determine what is the effect of a taser? Well, first of all, I'm comfortable with Mallory County's policy, which describes this as an intermediate level of force and equates it with the use of pepper spray. I'm comfortable with that for the purposes of this case and this record. And that's why we did not put on a lot of evidence, or any evidence to speak of, other than what the county put on in the summary judgment proceeding. So, like, in your case, we don't have the evidence that it's nothing more than a carpet. It's like having yourself shoved when you walk across a new carpet. That's not in your case. Yours is basically the Mallory County description. That's right. That's right. But I think if you want a better record, certainly there needs to be a case that will create that record, perhaps. I understand Mr. Burton has a case that's just been argued before another panel regarding that matter. But that's not an issue in our case. In our case, my client, by her own testimony, suffered enormous pain. She was totally immobilized. She fell to the floor. She pulled the darts out herself because the officer would not assist. And she has scars, one under her right breast and one in her hand, as a consequence of this incident. And she has the emotional scars of having had this happen to her in front of her children in her own house. In our view, that was unnecessary, especially when the police went there to protect her. I'm done. Thank you. Okay. Thank you. Mr. Buck, I think you're way over time. We'll give you a minute to go back and finish your statement. Hopefully, you don't need to put her on, Your Honor, but I appreciate it. You want to take the minute or not? I'm sorry. I thought you were going to ask a question. I'm a lawyer. I really only want to say one thing, though. It's following up on Judge Silverman's question. How do you gauge objective reasonableness in the Fourth Amendment context if you never look at what the alternatives are? And if your alternatives are, as Mr. Zubel says, wrenching a person who admits she was wedged in and would not get out of the car, and there's no evidence other than the officer's testimony that we considered those options and figured there was a greater risk of injury, how do you say that that creates a cause of action for the Fourth Amendment violation? Counsel, procedurally, where is this case? The summary judgment filed by the officers was denied. Is that correct? That's correct, Your Honor. And so this case would be tried to a jury if that order is upheld? That's correct, Your Honor. Yes. And Chief Judge Kuczynski, your decision in Scott v. Heiner goes directly to the heart of this. It's not whether there's a lesser alternative. There's a more reasonable alternative they could have picked. It's not whether five years from the incident. In our case, six years from the incident. Somebody can concoct something that makes more sense. These officers, on the record, considered the alternatives, knew there was greater risk from trying to wrench her out, and chose what they felt was the best. Thank you. Thank you. You have five minutes. Thank you, Your Honor. I just have a couple of points I want to make. I know that I was well over as well. And that is that the plaintiff refused medics in this case, and the reason the officer didn't assist in removing the prongs is because medics had been called, and she refused them. So I think that says a lot about injury in this matter. She didn't feel the need to have medics look at her. I'm not aware of the scarring because that has not been something that we've seen in the record in our case. In terms of plaintiff's complaint that he did not have the opportunity to pose the officers, I just want to make it clear that that's not based on us refusing to produce them. They were never noticed for deposition. Okay. Thank you. The case has just argued to pass, and this is where I jump. This part of the session has adjourned.
judges: Kozinski, Schroeder, Rymer, Silverman, Graber, McKeown, Fisher, Paez, Rawlinson, Clifton, Bea, Cjj